IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES K.,[1] ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 6704 |
| v. ) | |
| ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting ) | |
| Commissioner of Social Security,[2] ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER[3]

Before the Court are Plaintiff James K.'s motion to remand the Administrative Law Judge's ("ALJ") opinion denying his application for Social Security disability benefits[4] (D.E. 15) and the Commissioner's cross motion to affirm the opinion. (D.E. 25.)

---

[1] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On October 22, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 8.)

[4] The Appeals Council subsequently denied review of the opinion (R. 1), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

I.     **Background**

Plaintiff applied for Social Security disability benefits in April 2016, at the age of 33, alleging that he became disabled on October 9, 2007. (R. 15.) Plaintiff graduated college after five years, in May 2005, and he was last employed in 2006, when he worked a few weeks as a bank teller and grocery store clerk. (R. 196, 201.) He has always lived at home with his parents.

Plaintiff received weekly counseling from counselors at Associated Counseling & Wellness Center (Bruce Kornhaber, Ph.D., Constantine Bruns, Ph.D., and Stephen Remmert, M.A.) beginning in April 2014 (R. 331), and since at least 2015, he received twice-yearly treatment from psychiatrist Michael Raida, M.D., for obsessive compulsive disorder ("OCD") and anxiety disorder NOS (not otherwise specified). (R. 302.) In June 2015, Plaintiff's parents told his counselor that his compulsions were much improved, he was less irritable, and he was doing more around the house. (R. 301-02.) They attempted to get him into vocational rehabilitation, but he did not want to do the janitorial work that was offered. (R. 302.) In December 2015, Plaintiff's parents reported that he was "doing about the same," but he felt "clearer in his mind" and his headaches were very rare. (R. 298.) Plaintiff's mood was good, and he denied concerns regarding anxiety or compulsions, but he was "rather rigid in his thinking about the need to lose weight in order to work," stating that he would not work until he weighed 152 pounds, despite him weighing over 300 pounds. (R. 298-99.) Plaintiff took Xanax for anxiety and fluvoxamine for his OCD. (*Id*.) In February 2016, Plaintiff established care with internist Scott Schieber, M.D., who observed that Plaintiff was slightly anxious and had a restricted affect. (R. 310.)

In May 2016, Plaintiff and his mother filled out disability function reports. The reports noted that Plaintiff had difficulty with concentration, following directions and completing tasks; he got upset and gave up easily. (R. 216-22.) He could follow spoken instructions if they were

2

repeated several times, and he had no problem getting along with authority figures; however, he was fired from his last jobs because he could not learn the required tasks. (R. 221-22.) Plaintiff only spent time with family members, and he attended church and shopped with his parents. (R. 219-20.) He did no housework except for laundry, which took him several hours, and he had too much anxiety to handle paying bills or managing a checking account. (R. 216-20.) Plaintiff also had difficulty remembering appointments, how to use computer, and when to turn off appliances. (R. 243.)

On June 3, 2016, Dr. Schieber wrote that Plaintiff was "not able to hold a job" due to his "developmental disability, history of anxiety, and history of [OCD]," but that he was able to "care for himself" and "play video games." (R. 320.) On examination, Plaintiff was alert and followed commands, but he was "quite anxious" and "socially introverted." (*Id*.) The following day, Plaintiff told Dr. Raida he had lost weight and was feeling better about himself; his OCD concerns were "generally ok," involving rare checking behaviors. (R. 338.) He denied bothersome anxiety in his daily life, but Dr. Raida noted that Plaintiff had a "very limited life," "spend[ing] time mostly with parents" and avoiding situations that could cause him anxiety. (R. 338-39.)

On June 27, the counselors at Associated Counseling completed a psychological report of Plaintiff. After reviewing 2011 and 2014 neuropsychological assessments indicating Plaintiff had low average to average intellectual capabilities and the ability to learn and retain new information (R. 326-28), the report stated that Plaintiff showed "borderline processing speeds but low to average working memory," "impulsivity and tendency for risky decision making," and a "very difficult time interpreting social nuances, particularly in interacting with strangers." (R. 329.) The report opined Plaintiff had a mild mood disorder with symptoms of anxiety and OCD, which caused "attentional concerns" and rendered Plaintiff incapable of employment. (R. 329-30.) On

3

July 11, 2016, Mr. Remmert completed a psychiatric report, which stated that Plaintiff got headaches, was easily distracted, and became more confused and anxious under stress, making it difficult for him to concentrate and complete tasks. (R. 331-34.) He opined that Plaintiff needed step by step instruction and supervision to understand and complete tasks. (R. 333.)

On July 21, a non-examining state agency physician opined that Plaintiff did not have severe mental impairments, with only mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace and no restrictions in activities of daily living ("ADLs"). (R. 84-85.) This opinion was affirmed on reconsideration. (R. 93-94.)

In November 2016, Plaintiff followed up with Dr. Raida, who noted that Plaintiff was "doing well overall" and his headaches were better, but he was still not doing much outside of the house. (R. 341.) Plaintiff had stopped taking Xanax in July, and it "went well;" he did not have withdrawal and his anxiety did not worsen. (*Id*.) Plaintiff reported that he had started a coin business, purchasing coins from banks and selling them to shops. (*Id*.) The following month, Plaintiff restarted Xanax because his anxiety was increasing. (R. 378-79.)

The record contains notes from Plaintiff's sessions with Associated Counseling beginning in January 2017. His counselor noted at various times that he was very anxious and depressed, had trouble concentrating, and was frightened, withdrawn and isolating himself. (R. 389-92.) On March 15, 2017, Dr. Bruns filled out a mental impairment form listing Plaintiff's diagnoses as generalized anxiety disorder, OCD and schizotypal personality disorder.[5] (R. 343.) He opined that due to Plaintiff's symptoms (including inappropriate affect, difficulty concentrating, obsessions or

---

[5] "People with schizotypal personality disorder . . . generally don't understand how relationships form or the impact of their behavior on others. . . . These problems may lead to severe anxiety and a tendency to avoid social situations. . . . [T]reatment, such as medications and therapy, can improve symptoms." https://www.mayoclinic.org/diseases-conditions/schizotypal-personality-disorder/symptoms-causes/syc-20353919.

4

compulsions, feelings of worthlessness, persistent anxiety, oddities of thought, perception, speech or behavior, pathological dependence or passivity, and persistent daily headaches), Plaintiff was markedly limited in all 17 categories of mental abilities and aptitude needed to perform unskilled or simple work, and had marked limitations in ADLs, maintaining social functioning and maintaining concentration, persistence or pace. (R. 343-45.) Additional counseling records from March and April 2017 noted at various times that Plaintiff was very depressed and anxious, felt worthless and hopeless, and felt overwhelmed and lacked motivation. (R. 393-95.)

On May 6, 2017, at a follow-up visit with Dr. Raida, Plaintiff's mood and affect were normal but Dr. Raida found Plaintiff was "[r]ather rigid in his thinking and [felt] that he [could] not do certain types of work for unusual reasons." (R. 380-81.) Dr. Raida explained that:

> Patient says that he has placed 'two million coins' back into circulation. . . . Says that he is working 14 hours per day on this task and goes to eight banks per day when he works on it. He has not sold any coins yet and thus has not made any money. . . . Says that he has lost 11 pounds in six days? . . . When asked about other jobs he could do, he said that he could teach billiards as he has played billiards. He is not aware of any other vocational options he could do. Could not do Uber as he feels it is too dangerous and people get murdered driving Uber. Has fears of delivering packages as he fears that he might transport illegal things like transporting drugs without knowing it.

(*Id.*) Plaintiff refused to consider residential treatment options for anxiety. (*Id.*) On May 16, Dr. Raida filled out a mental impairment form listing Plaintiff's diagnoses as OCD, anxiety disorder NOS and "probable schizoid personality disorder (would not say schizotypal)."[6] (R. 346.) Dr. Raida opined that Plaintiff's symptoms (including difficulty thinking or concentrating, social withdrawal, inappropriate affect, obsessions or compulsions, feelings of guilt/worthlessness,

---

[6] "Schizoid personality disorder is an uncommon condition in which people avoid social activities and consistently shy away from interaction with others. They also have a limited range of emotional expression. . . . Talk therapy, and in some cases medications, can help." https://www.mayoclinic.org/diseases-conditions/schizoid-personality-disorder/symptoms-causes/syc-20354414.

5

generalized persistent anxiety, and pathological dependence or passivity) left him markedly limited in almost all categories of mental abilities and aptitude needed to do unskilled work, and that he had marked difficulties in performing "instrumental" ADLs, maintaining social functioning, and maintaining concentration, persistence or pace. (R. 346-48.) Dr. Raida wrote that:

> due to anxiety/discomfort, unwilling/able to participate in activities that involve stress or working with others. Life is essentially him and his family. . . . [P]ast work failures, probable personality disorder, severe anxiety, cognitive deficits (see testing) and dependence on family all lead to a very poor prognosis for him. I would anticipate years of gradual exposure to work to get him to any sort of independent status or work options and seem very limited due to anxiety and what appear to be an inability to initiate tasks.

(R. 346, 348.) Dr. Raida noted that Plaintiff tolerated his medications well, with benefits for OCD, but opined that "this will only address a small portion of his symptoms." (R. 346.)

In June 2017, notes from Plaintiff's counseling sessions indicated he was afraid "of a wide range of unidentifiable things that are keeping him from leaving the house" and was "developing delusional thoughts about his capacities." (R. 398-99.) That month, Plaintiff also had an annual exam with Dr. Schieber, who noted Plaintiff was "[d]oing very well, active with video games, independent activities of daily living. Unable to work due to his disability. Tolerating medications without side effects." (R. 350.) In August, counseling notes stated that Plaintiff showed obsessive compulsive symptoms that kept him from leaving his home, and in September and October, he showed disorganized speech, difficulty thinking and delusions of grandeur about becoming a professional billiards teacher or fashion consultant. (R. 403-06.)

On November 4, 2017, Plaintiff and his parents met with Dr. Raida. Plaintiff reported spending up to 50 hours per week driving to banks and separating coins; he had not returned to vocational rehab because of his concerns about germs. (R. 383.) Dr. Raida wrote that there was "[n]o indication for making medication changes as I don't think medication changes will address

6

some of these barriers to work based on improbable concerns." (R. 384.) Plaintiff continued to attend counseling sessions about twice a month, and notes over the next several months showed, at various times, apathetic mood, obsessive or ritualistic behavior, feelings of depression and failure, inability to concentrate or complete tasks for goal setting, despondency, paranoia, muddled thinking and disordered thoughts. (R. 410-15.)

On May 12, 2018, Plaintiff told Dr. Raida that "not . . . much [was] different over the last six months." (R. 386.) Dr. Raida noted that "[t]here continue[d] to be some obsessional beliefs that impact various aspects of his life," including fear of getting lost, fear of using a smart phone in case he accidently went to the wrong website, refusal to wear certain clothes twice, and his belief that he could make a career "selling advice" on skin care or the stock market or teaching billiards. (R. 386-87.) Dr. Raida opined Plaintiff was "seriously impaired by his symptoms," but Plaintiff was not interested in a residential or intensive outpatient program because he felt he had "responsibilities at home." (R. 386-88.) Dr. Raida doubted that changing Plaintiff's OCD medicine would have a significant clinical impact. (*Id*.)

II.     **Hearing Testimony**

On July 6, 2018, Plaintiff, his mother, Dr. Kornhaber, and a vocational expert ("VE") testified at his hearing. Plaintiff testified that he lost his job as a bagger at Jewel because he had trouble learning how to pack groceries, following directions and paying attention to his supervisor, and his headaches became too much for him to handle. (R. 42-46.) Plaintiff had no trouble driving a car, explaining that "[i]t's simpler to drive than it is to work" because he could not accept or process the responsibilities of working. (R. 47-49.) He spent his days watching television, playing video games and playing with his dogs, but he did not walk or feed them because he was afraid of the responsibility if they bit someone or he forgot to clean up after them. (R. 49-50.) The ALJ

asked Plaintiff's mother how he could concentrate enough to drive, finish college and play video games, but could not do a "factory kind of job . . . that involves maybe one or two- step tasks." (R. 56-57.) Plaintiff's mother testified that Plaintiff plays "Mario Brothers. That's it, Mario Brothers," and that his sickness got worse after college. (R. 57-58.)

Dr. Kornhaber testified that Plaintiff had "been consistently deteriorating at least over the last year, and even before then it was very difficult for him to concentrate," and that "[m]ore recently, there's been a lot of signs of delusion," such as wanting to be the CEO of a billiards teaching company, and that he was "having more and more episodes of anxiety attacks." (R. 65-67.) The ALJ questioned why Plaintiff continued to see Dr. Kornhaber and take medication when "he ha[d] no desire to leave his parents' home," no goals, and "no desire to work." (R. 71.) Dr. Kornhaber responded that the treatment helps Plaintiff "manage himself" and "manage his anxiety," but the doctor did not "believe that [he was] ever going to be able to function any higher than he's functioning now." (R. 72.)[7] At the end of the hearing, the VE testified that a significant number of jobs would be available to a hypothetical person who could work in simple, routine and repetitive jobs, with incidental contact with the public, occasional contact with supervisors and coworkers, and off-task time up to 15 percent of the day. (R. 77-78.)

### III. ALJ Opinion

On October 17, 2018, the ALJ determined that Plaintiff had not been disabled since the date his application was filed. (R. 26.) The ALJ found that Plaintiff's anxiety and OCD were severe impairments, but that his "other affective disorders" were not severe. (R. 18.) The ALJ wrote that Plaintiff's treatment providers "focused on treating his mental health impairments in the context of anxiety and OCD," and they had "difficulties . . . diagnosing" Plaintiff's mental health

---

[7] In August 2018, Dr. Kornhaber submitted a letter stating that Plaintiff graduated college with the help of special accommodations and his parents and had been unemployable since soon after graduating. (R. 291.)

8

impairments as potentially schizoid personality disorder or schizoaffective disorder. (*Id*.) The ALJ also noted that "mental status examinations generally show[ed] euthymic mood, only somewhat flat or congruent affect, and occasional smile or laugh." (*Id*.) The ALJ found Plaintiff's "history of headaches" non-severe because "there is no evidence that [he] pursued any treatment or received medication" for them, and he "reported that his headaches improved or were less frequent." (*Id*.)

The ALJ reviewed the paragraph B criteria and found that Plaintiff's impairments alone or in combination did not meet a Listing. The ALJ "acknowledge[d]" Plaintiff had "limitations in his ability to perform tasks and interact socially," and determined that he had moderate limitations in interacting with others, adapting or managing oneself, and concentrating, persisting or maintaining pace, and mild limitation in understanding, remembering or applying information. (R. 18-19.) The ALJ assigned Plaintiff a residual functional capacity ("RFC") to perform "simple, routine, repetitive work with only incidental contact with the public, only occasional contact with supervisors and co-workers," and up to 15 percent time off-task. (R. 20, 24.)

The ALJ found Plaintiff's statements of extreme difficulty following instructions, paying attention, and remembering were "not entirely consistent with the medical evidence and other evidence in the record." (R. 19-21.) The ALJ wrote that Plaintiff's college degree showed he was "able to function without a highly structured setting" and "adapt to change on a day-to-day basis, as well as a semester-to-semester basis." (R. 19-20.) In addition, the ALJ found Plaintiff's allegations of disability were inconsistent with his reports that he: spent time with others; attended church regularly; had no problem getting along with family, friends and neighbors; regularly played video games, sometimes up to 11 hours per day; "dr[o]ve a car without any difficulty regarding concentrating on the road or paying attention to signs and traffic signals;" went to school "without problems;" had "no problem with self-care;" was "able to visit banks to exchange coins

for his coin-collecting business;" and could do laundry. (R. 19, 21.) The ALJ also found Plaintiff's allegations were undercut by his 2011/2014 neuropsychological assessment (described in his counselors' June 2016 report), which showed an "ability to learn new information" and "average abilities on verbally and visually mediated measures of attention and working memory." (R. 19.)

The ALJ acknowledged that Dr. Kornhaber's counseling notes indicated Plaintiff "sometimes struggled with anxiety and depression; reported difficulty concentrating; at times showed obsessive, ritualistic behavior, and was sometimes confused and angry." (R. 22.) However, the ALJ found that Dr. Raida's reports "showed that [Plaintiff] denied significant anxiety, had no concerns with compulsions[,] was working as much as 50 hours a week going to banks for his coin collecting business," "had normal speech, congruent mood and normal range and modulation, was also goal directed, organized, logical, linear, had no abnormal thought content, had no suicidal ideation, had intact insight and judgment and was oriented times 4." (R. 21-22.) The ALJ specifically noted that Plaintiff had tapered off Xanax in July 2016, "which went well." (R. 22.)

The ALJ gave "little weight" to every medical opinion in the record. First, the ALJ found the non-examining state agency opinions were "inconsistent" with "the entire evidence of record as well as hearing testimony," which showed that Plaintiff had severe mental impairments. (R. 22.) Second, the ALJ found the "extreme limitations" in Dr. Raida's opinion were inconsistent with Dr. Raida's "generally benign mental status examinations" and his "treating recommendations, which encourage[d] vocational rehabilitation." (R. 23.) The ALJ also found Dr. Raida's opinion inconsistent with "evidence of the claimant's ability to obtain a college degree, operate a motor vehicle and maintain the concentration and focus to play video games for up to 11 hours per day."

10

(*Id*.)[8] The ALJ acknowledged Dr. Raida had treated Plaintiff for years but noted that they only met every six months. (*Id*.) Third, the ALJ found Dr. Bruns' opinion was "inconsistent with counseling records showing no significant concerns about anxiety or OCD symptoms." (*Id*.) Fourth, the ALJ determined Mr. Remmert's opinion was "inconsistent with the record as a whole, as well as Mr. Remmert's mental status examination performed prior to writing his opinion," at which Plaintiff "had an agreeable mood but flat affect," "coherent logical thought processes, no delusions, could recall 8 numbers forward and 4 numbers backward, could recall recent news events[,] knew the route taken to the examination, "was able to name 5 past presidents, knew his birthday and successfully completed serial 7s." (*Id*.) Fifth, the ALJ found Dr. Kornhaber's opinion was "out of proportion with the record as a whole, specifically, with examinations performed by Dr. Raida and with the claimant's own testimony." (R. 23-24.) Sixth, the ALJ found Dr. Schieber's opinion that Plaintiff was unable to work or hold a job was vague and inconsistent with Dr. Schieber's notes that Plaintiff could "play video games and care for himself" and "follow commands." (R. 24.)[9]

In conclusion, the ALJ recognized that the record showed Plaintiff had "an unusual demeanor and ha[d] not learned many practical skills," but pointed to his "low average to average intelligence," failure to test "positive for ADHD or autism," unwillingness to attend vocational rehabilitation and belief that he could not work for "unusual reasons," as showing that Plaintiff's lack of employment was not due to his severe mental impairments. (R. 24.) Thus, the ALJ found Plaintiff was able to perform the jobs available for the RFC she assigned. (R. 25-26.)

---

[8] The ALJ cites to Plaintiff's hearing testimony for his ability to play video games for up to 11 hours per day (R. 23), but Plaintiff did not testify about the number of hours he spent playing video games, and the Court did not see evidence of this in the record.

[9] The ALJ gave partial weight to Plaintiff's mother testimony, finding that her statements regarding Plaintiff's ADLs were "generally consistent" with his reports, but that her statement that Plaintiff had difficulty controlling his temper was inconsistent with his statements and the evidence of record. (R. 24.)

11

IV. Analysis

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high," *id*., but it was not met in this case.

A. **The ALJ Substituted Her Lay Opinion for the Expert Opinions in the Record.**

"Where a judge rejects a treating physician's opinion because it does not align with the judge's own incorrect interpretation of the medical evidence, that decision is not supported by substantial evidence." *Kaminski v. Berryhill*, 894 F.3d 870, 874 (7th Cir. 2018). "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). Here, the ALJ "strayed beyond [her] expertise as an adjudicator and into the forbidden territory of playing doctor," *Mandrell v. Kijakazi*, 25 F.4th 514, 518 (7th Cir. 2022), rejecting Drs. Raida's, Kornhaber's and Bruns' expert opinions in favor of her own lay opinions.

First, for reasons unknown and not offered by any medical professional in the record, the ALJ found the lack of diagnoses for ADHD or autism to be evidence that Plaintiff was able to work. (R. 24.) Second, the ALJ determined that because neuropsychological assessments from 2011 and 2014 showed Plaintiff had low average to average intelligence, Plaintiff could work full-time. But the mental health experts who analyzed those assessments (the assessments themselves were not in the record) – Dr. Kornhaber, Dr. Bruns and Mr. Remmert – opined that despite those test results, Plaintiff's multiple symptoms of anxiety and OCD rendered him incapable of employment. (R. 329-30.) Third, despite Dr. Kornhaber's diagnosis of schizoaffective disorder and Dr. Raida's diagnosis of probable schizoid personality disorder, the ALJ used her own lay

12

opinion to conclude that Plaintiff did not have a severe personality disorder simply because the two doctors did not offer the same diagnosis. Fourth, the ALJ rejected those experts' opinions that Plaintiff's belief that he could make money selling coins, teaching billiards or selling skincare advice showed he was delusional, and instead substituted her own interpretation of this evidence, concluding that "working as much as 50 hours a week going to banks for his coin collecting business" showed Plaintiff *could* work full time, despite him never making any money with that venture. Fifth, the ALJ concluded that Plaintiff's "unusual reasons" for not working or attending vocational rehabilitation would not keep him from working full-time (R. 24), despite Dr. Raida and Dr. Kornhaber pointing to those unusual reasons as evidence that Plaintiff was delusional and would *not* be able to work full-time.

The impact of mental illness may be difficult for lay persons to understand fully, which is why the Seventh Circuit appropriately has instructed judges that as lay persons, they lack the expertise to substitute their opinions for those of the medical experts. *See Lambert*, 896 F.3d at 774. Unfortunately, substituting her opinion for the opinions of the medical experts is what the ALJ did here. The ALJ's attempt to usurp the role of the medical experts requires remand.

**B.    The ALJ's Decision to Give Little Weight to Dr. Raida's Opinion Was Not Supported by Substantial Evidence.**

To reach the substantial evidence threshold, ALJs "must consider all relevant evidence;" they "may not selectively consider medical reports, especially those of treating physicians," *Mandrell*, 25 F.4th at 519. Neither are ALJs allowed to "ignore entire swaths of [evidence] that point toward a finding of disability." *Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021). The ALJ here found the limitations in Plaintiff's treating psychiatrist's opinion to be "extreme" and inconsistent with Dr. Raida's own "generally benign mental status examinations" and "treating

13

recommendations, which encourage[d] vocational rehabilitation." (R. 23.) These findings ignored evidence that supported Dr. Raida's opinion and misconstrued Dr. Raida's treatment notes.

Contrary to the ALJ's conclusion, Dr. Raida's opinion was consistent with his examinations. Although the ALJ emphasized that Plaintiff usually denied significant concerns with anxiety and compulsions and demonstrated normal speech, congruent mood, organized and logical thinking, intact insight and normal orientation (R. 21-23), the ALJ overlooked that Dr. Raida also consistently found that Plaintiff had unusual mannerisms, poor confidence/esteem and obsessions/compulsions and that he was completely dependent on his family. Moreover, in 2017, Dr. Raida added a diagnosis of probable schizoid personality disorder, which was consistent with his examinations documenting Plaintiff speaking of spending 14 hours a day driving to banks, losing 11 pounds in six days and contemplating a career as a billiards instructor or skincare advisor.

In addition, the ALJ's conclusion that Dr. Raida's recommendation of vocational rehabilitation showed that Plaintiff could work completely ignores the serious constraints Dr. Raida put on these recommendations: he "anticipate[d] years of gradual exposure to work to get [Plaintiff] to any sort of independent status or work options." (R. 346-48.) The ALJ misapprehended Dr. Raida's opinion to suggest that with some vocational training, Plaintiff could find and hold work, but that is not at all what Dr. Raida opined. This misapprehension of the evidence adds to the Court's concern that the ALJ's reliance on her own lay opinions ran afoul of the Seventh Circuit's prohibition against ALJs "playing doctor."

Moreover, under the Social Security regulations, before rejecting treating physician opinions, the ALJ must consider "the extent to which [these] opinions were consistent with the diagnoses and opinions of other medical sources who treated [the claimant]." *Gerstner v. Berryhill*, 879 F.3d 257, 262-63 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c) (for applications filed before

14

March 27, 2017)). *See also Reinaas v. Saul*, 953 F.3d 461, 465 (7th Cir. 2020). However, the ALJ failed to consider that Dr. Raida's opinion was not only consistent with Dr. Kornhaber's testimony, but it was also consistent with the opinions of Dr. Bruns and Mr. Remmert. The ALJ's decision to give little weight to every medical opinion in the record improperly ignored the extent to which these opinions were largely consistent with each other. The ALJ's approach amounted to a glaring omission that prevents us from concluding that the ALJ's decision was supported by substantial evidence.

      **C.    The ALJ Ignored Evidence that Plaintiff's Impairments Had Worsened Since College.**

The ALJ repeatedly emphasized that Plaintiff's ability to obtain a college degree was evidence that he could work, finding that it showed Plaintiff could function socially without a highly structured setting and adapt to changes on a day to day or semester by semester basis. (R. 19-20.) But the ALJ's determination fails to acknowledge that Plaintiff's alleged onset date was more than two years after he finished college, and that "[l]ater medical records and testimony suggested that [Plaintiff's] symptoms were becoming worse and that [his] work-related limitations were increasing." *Lothridge*, 984 F.3d at 1234. Multiple medical professionals opined that Plaintiff's symptoms had deteriorated in the 13 years since he finished college. For example, Dr. Raida's reports in 2017 and 2018 added a diagnosis of probable schizoid personality disorder to the previous diagnoses of anxiety and OCD and described Plaintiff having obsessional beliefs. In addition, Dr. Kornhaber testified that Plaintiff had "been consistently deteriorating at least over the last year," with "a lot of signs of delusion." (R. 65-67.)

In contrast to the ALJ's failure to acknowledge that Plaintiff's symptoms had worsened since college, and especially in the years before the administrative hearing, the ALJ emphasized Dr. Raida's November 2016 mention of a brief episode of Plaintiff going off Xanax and doing

15

well. (R. 22.) However, the ALJ made no mention of Plaintiff having restarted Xanax the next month due to increasing anxiety. This is not only a misinterpretation of the medical record, but also an impermissibly selective approach to interpreting that record. The Seventh Circuit has specifically instructed judges not to take this sort of approach in Social Security matters. *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020). In *Martin*, an ALJ had found that the claimant could perform physical work at all exertional levels by selectively crediting some of the findings of a state-agency examining doctor while ignoring that doctor's other findings that the claimant had serious neck and back problems. *Id*. The Seventh Circuit reversed the district court's affirmance of that ALJ, calling the ALJ's approach to the state-agency doctor's findings "impermissible cherry-picking – highlighting facts that support a finding of non-disability while ignoring evidence to the contrary." *Id*. In the instant case, the ALJ's selective reliance on Dr. Raida's mention of Plaintiff temporarily doing well while off Xanax, when Drs. Raida and Kornhaber found that Plaintiff's mental illness and mental functioning in fact had significantly worsened over time, is a classic example of the kind of "cherry-picking" that requires us to remand.

      **D.**    **The ALJ Misconstrued Plaintiff's Testimony.**

The ALJ also found that Plaintiff's claims of severe mental limitations were inconsistent with Plaintiff's testimony that he could, among other things, "maintain the concentration and focus to play video games for up to 11 hours per day" and drive a car (R. 23) and "spend[] time with others and go[] to church on a regular basis . . . [with] no problems getting along with family, friends, neighbors." (R. 19.) This conclusion misconstrues Plaintiff's testimony.

First, Plaintiff never testified that he played video games up to 11 hours per day. The record contains no evidence that he said any such thing, or that his video game-playing came anything close to 11 hours a day. Instead, Plaintiff testified that during the day he "tr[ied] to

16

entertain [him]self with television and video games." (R. 49.) Moreover, beyond Plaintiff's mother's testimony that he only played Mario Bros., there is no evidence in the record as to the level of concentration and focus Plaintiff used to play video games. Without such evidence, the ALJ had no basis to conclude that Plaintiff could concentrate well enough to work. The Court senses here an almost visceral adverse reaction to the idea that someone who plays video games all day long is too mentally disabled to work, but the record does not show that Plaintiff played video games all day, and the record does not show how whatever gaming he did might demonstrate an ability to concentrate well enough to allow an ALJ to conclude, based on substantial evidence, that his video gaming even bore upon the disability calculus. This area of the record strikes the Court as underscoring how much care ALJs and reviewing courts must take in recognizing when their lay opinions impermissibly stray into the forbidden zone of "playing doctor." In a different case, with a more developed record, perhaps substantial evidence might support a conclusion that certain types or extents of video gaming might well cut against a finding of disability. But this matter is not that case.

Second, the ALJ appeared to equate Plaintiff's ability to drive with an ability to concentrate enough to work five days a week, eight hours a day. This was improper, as ALJs may not equate activities of daily living with the activities of a full-time job. *See, e.g., Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020). Although Plaintiff reported at different times that he worked up to 50 hours a week or 14 hours a day going to banks to sell coins without any financial success (and that is not surprising given the evidence about Plaintiff's delusional mindset about his ability to make a gainful living), Drs. Raida and Kornhaber offered this as evidence of Plaintiff's delusions rather than evidence that Plaintiff actually spent 14 hours

17

driving each day. (Indeed, that would be an impossible feat if Plaintiff also spent, as the ALJ mistakenly stated, 11 hours playing video games each day.)

Third, the ALJ's statement that Plaintiff had no problems getting along with family, friends and neighbors misconstrues Plaintiff's testimony and his function reports, which indicated that he only spent time with family members, specifically his mother. (R. 219-20.) This is consistent with Dr. Raida's observation that for Plaintiff, "[l]ife [was] essentially him and his family." (R. 346.) In the Court's view, this particular record would have posed numerous challenges for any ALJ. With the greatest respect, the Court concludes that the ALJ simply misapprehended the nature of the evidence in the foregoing ways, requiring the Court to find that the ALJ's elevation of her own lay opinions above the opinions of the medical experts left her decision unsupported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the ALJ's decision was not supported by substantial evidence. Accordingly, the Court grants Plaintiff's motion to remand (D.E. 15) and denies the Commissioner's motion to affirm (D.E. 25).

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: July 13, 2022**